UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CIV-80749-MATTHEWMAN

RENE AMECHAZURRA SUAREZ,

     Plaintiff,

v.

NANCY BERRYHILL,
Acting Commissioner of Social Security
Administration,

     Defendant.

_____/



FILED by _____ D.C.

SEP 1 7 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DE 18, DE 19]

**THIS CAUSE** is before the Court upon Plaintiff, Rene Amechazurra Suarez's ("Plaintiff") Motion for Summary Judgment and Memorandum of Law in Support Thereof [DE 18], and Defendant, Nancy Berryhill, Acting Commissioner of Social Security Administration's ("Defendant") Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment [DE 19]. The parties have consented to magistrate judge jurisdiction. [DE 15]. The issues before the Court are whether the record contains substantial evidence to support the denial of benefits to Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I. FACTS

On March 12, 2013, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. [R. 25]. Plaintiff also filed a Title XVI application for supplemental security income on March 12, 2013. *Id.* In both applications, Plaintiff asserted a disability on-set

1

date of March 1, 2012. *Id.*[1] Both applications were denied initially on May 29, 2013, and upon reconsideration on November 25, 2013. *Id.* Following a video hearing on August 26, 2015, Administrative Law Judge Jerry Faust (the "ALJ") issued a decision on November 4, 2015 denying Plaintiff's request for benefits. [R. 25-37]. A request for review was filed with the Appeals Council and denied on April 24, 2017. [R. 1-3].

## A. Hearing Testimony

The ALJ held a video hearing on August 26, 2015. [R. 47]. Plaintiff's counsel began by stating that Plaintiff suffers from several problems including fibromyalgia, a left rotator cuff tear, chronic anxiety disorder and major depressive disorder. [R. 49]. Plaintiff's counsel[2] argued that even though the illnesses do not meet or equal a listing, the illnesses preclude Plaintiff from engaging in any type of substantial gainful activity. *Id.*

Plaintiff stated that he is not married and has two children under the age of 18. Plaintiff was born on September 27, 1969, making him 45 years old at the time of the hearing. [R. 51]. Plaintiff completed twelfth grade in Cuba. *Id.* He did not attend school, vocational school, trade school, or college in the United States. *Id.* Plaintiff also testified that he cannot read, write, speak, or understand the English language. He stated that he had worked as a baker from the year 2000 until he stopped working. *Id.* He stated that he first worked in a small, private bakery and then worked as a baker for Sam's Club, owned by Walmart. [R. 52]. Plaintiff stated that he began work at 9:00 p.m. and finished at 5:00 a.m. According to Plaintiff, his duties included baking bread, specifically getting the loaves of bread out of the freezer, putting them in the oven, and taking them out of the oven. *Id.* He said that he stood while he worked. *Id.* He also stated

---

[1] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 12.
[2] At the time of the hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff is currently proceeding *pro se.*

that he had to lift heavy boxes that weighed more than 15 or 20 pounds. [R. 53]. In the past 15 years, Plaintiff has only worked as a baker. *Id.*

Plaintiff testified that he did not work after March 1, 2012, which is the date he has alleged he became disabled. *Id.* He testified that due to his left rotator cuff tear, he has a lot of pain in the left arm. *Id.* He rated this pain as an eight on a scale of one to ten. *Id.* Plaintiff stated that medications help for a little bit, but after he starts moving around his pain returns. [R. 54]. According to Plaintiff, he cannot do much with his left hand and left arm because it causes pain all over the front of his body and his back. *Id.* Plaintiff testified that he cannot lift a gallon of milk with his left arm because, if he tries, he gets tired and has pain at the front of his chest and his back. *Id.*

Plaintiff next discussed his fibromyalgia. *Id.* He stated that his fibromyalgia pain starts at his back and also hurts his front, including his chest and stomach, and down his legs. [R. 55]. Plaintiff rated this pain as a nine on a scale of one to ten. *Id.* He explained that the pain medication causes the pain to decrease to a four on a scale of one to ten. *Id.* Plaintiff stated that he could only walk for less than half a block because he would become fatigued and start sweating. *Id.* He stated that he could only stand for ten minutes, because after ten minutes, pain begins in his arms and legs. *Id.* Plaintiff testified that he can squat or kneel sometimes. [R. 56]. He stated that he cannot lift objects off of the ground. *Id.* He also stated that he could lift a water bottle off of the table with his right arm, but he gets pain right away in his arms. *Id.*

Plaintiff then discussed his anxiety symptoms. *Id.* He testified that when he drives, he gets anxiety and his chest starts hurting. [R. 56-57]. He stated that he starts to panic and feels like he is going to have a heart attack. [R. 57]. Plaintiff said that these attacks happen frequently, on a

daily basis. *Id.* Plaintiff also testified that his wife supports him by paying his bills. [R. 58].[3]
Plaintiff said that this made him very uncomfortable because he cannot bring any income home.
*Id.* Plaintiff testified that he has no hobbies or interests. *Id.* He stated that before he became ill,
he used to take his children out to entertain them. *Id.* He said that he can sometimes watch
television, but he often has to get up and start moving. *Id.* Plaintiff also said that he could not
read and understand a magazine article or a page in a book because his disability has caused
blurry vision and he cannot see well. [R. 59]. Plaintiff said that he takes clonazepam and Flexeril
at night in order to sleep, but he stated that he takes his medication the way that it is supposed to
be taken and does not need his wife to remind him to take it. *Id.* Plaintiff added that he does not
have a social life outside of his immediate family, and when he goes out to eat with his wife,
pain begins and they are forced to leave. [R. 60]. Plaintiff testified that he lives with his wife and
her son, who is 7. *Id.* He stated that his wife cleans the house, takes her son to school, and cooks.
*Id.* Plaintiff stated that during the day, he spends time with his small dog, and he takes the dog
out when he needs to. *Id.*

   Then, the ALJ asked questions of Plaintiff. Plaintiff testified about his eyesight.
According to Plaintiff, his eyesight has been blurry since he received a catheterization, when a
nurse looked into his eyes with a flashlight and told him his pupils were dilated. [R. 61]. Plaintiff
stated that he was prescribed glasses at the eye doctor, but they do not work anymore. *Id.*
Plaintiff testified that he does not have a driver's license. [R. 61-62]. He said his license was
suspended because he could not pay child support. *Id.* Plaintiff said he went into a deep
depression because he found out he could be arrested for failing to pay his child support. *Id.*

---

[3] Plaintiff later clarified that he is not married to the woman he describes as his wife, but that she is his girlfriend.
He referred to himself as single because he is divorced from the woman with whom he came to the United States
from Cuba. *See* R. 64

Plaintiff testified that he stopped working because one day, he started to feel a debilitating pain down his arm and his leg, and it was so severe that he thought he was having a heart attack. [R. 63]. Plaintiff stated that he went to the emergency room at Kendall Regional. *Id.* Three years later, he was diagnosed with fibromyalgia. *Id.* Plaintiff stated that his shoulder pain during the hearing was at seven out of ten, and his fibromyalgia pain was at an eight or nine out of ten. [R. 64-65]. Plaintiff also stated that he frequently sees a psychiatrist. [R. 65]. According to Plaintiff, he has been hospitalized on a psychiatric basis in West Palm Beach, Florida, but there was no record of this event. *Id.*

Plaintiff testified that he can only sit for 15 minutes at a time. *Id.* He also testified that he has never attended vocational rehabilitation. *Id.* Plaintiff said that he has never taken English lessons, and that he did not need to speak English at work. *Id.* Besides taking medication, Plaintiff stated that he is not doing anything else to treat his fibromyalgia. *Id.* He stated that the doctor recommended that he walk a little bit, but he does not do that because it causes him pain. *Id.*

Next, Julia Blinz Bose, a vocational expert, testified. [R. 67]. She classified Plaintiff's past work as a baker at the medium level of exertion and as a skilled occupation, and she classified Plaintiff's past work as a maintenance worker at the medium level of exertion and as an unskilled occupation. [R. 69]. The ALJ posed the vocational expert a hypothetical in which an individual was 42 to 45 years old, with a high school education in Cuba, who could not communicate in English. *Id.* The hypothetical individual has the same past work experience as Plaintiff, and can lift and carry 20 pounds occasionally, 10 pounds frequently, sit with breaks for 6 of 8 hours, stand and walk with normal breaks for 6 of 8 hours. The hypothetical individual is right handed and cannot do any overhead lifting or reaching on the left, and no more than

frequent lifting or reaching in other directions. *Id.* The hypothetical individual also can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds, can frequently balance, occasionally stoop, kneel, crouch, and crawl, can perform simple routine tasks, and can have occasional and superficial interaction with others. [R. 69-70]. The vocational expert found that this hypothetical individual could perform the past work of maintenance worker.[4] [R. 70]. The vocational expert further stated that the individual could perform light, unskilled jobs, and stated that the individual could work as a laundry folder, a cleaner polisher, or a plastic mold machine operator. *Id.*

Next, the ALJ posed a hypothetical in which an individual could do everything listed in the first hypothetical, except that the individual could only lift and carry 10 pounds occasionally, five pounds frequently, and stand and walk just 2 of 8 hours in a day. [R. 71]. The expert responded that such an individual could not perform any past work, nor could he perform any other jobs. *Id.*

The ALJ posed a third hypothetical in which an individual could do everything listed in the first hypothetical, except that the individual had no mental limitations but had a poor ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, maintain concentration and attention, and understand, remember, and carry out simple instructions. [R. 71-72]. The expert responded that this individual would be able to do the claimant's past work, but would not be able to do any other work. [R. 72].[5] The ALJ asked the expert to additionally assume that, due to a combination

---

[4] The transcript of the hearing reads: "the past work of [INAUDIBLE] worker can be performed based on this hypothetical." Because Plaintiff's past work was as a baker and as a maintenance worker, the Court infers that the vocational expert said "maintenance."

[5] The transcript of the hearing reads: "Q: Would such an individual be able to do the claimant's past work? A: Yeah. Q: Would they be able to do any other work? A: No. That would rule out work altogether." The VE's answer to the

of impairments and resulting symptoms, the individual would be off task 15% of the workday or workweek. *Id.* The vocational expert responded that such an individual would not be able to perform any work. *Id.*

The ALJ posed another hypothetical in which an individual could do everything listed in the first hypothetical, except that the individual would miss work two days per month, be late two days per month, have to leave early two days per month, or any combination of those two days a month. *Id.* The expert responded that such an individual could not perform any past work, nor could he perform any other jobs. *Id.*

Plaintiff's counsel then asked a few questions of the vocational expert. [R. 73]. Counsel posed a hypothetical in which an individual had the same vocational background as the claimant, and who can only stand at one time for 15 minutes, sit at one time for 30 minutes, lift occasionally less than 5 pounds, frequently none, who cannot bend, stoop, or raise the left arm above shoulder level. *Id.* The expert testified that this hypothetical individual would not be able to engage in the claimant's past relevant work or in any other work. [R. 74].

B.  Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

On January 9, 2012, Plaintiff presented to the Emergency Room at Palmetto General complaining of left upper back pain. [R. 539]. Plaintiff stated that the pain started four months prior after a motor vehicle crash. *Id.* Plaintiff said he had been evaluated by a private medical doctor and had a CT of his neck. *Id.* Plaintiff said he had been told he had nerve pain. Plaintiff told the physician he had been taking Indomethacin for his pain. *Id.* The physician noted that

---

ALJ's question is therefore ambiguous.

Plaintiff's back was positive for pain at rest, with movement, and it radiated pain. *Id*. There was no decreased range of motion or vertebral tenderness. *Id*. According to the physician, Plaintiff was awake, alert, and in no acute distress. *Id*. Upon discharge, the physician noted that his impression was that Plaintiff had myofascial pain syndrome. [R. 541]. Plaintiff was prescribed Norflex and Vicoprofen. *Id*.

On January 16, 2012, Plaintiff presented to Palmetto General Hospital complaining of back pain and radiculopathy. [R. 510]. Plaintiff underwent an MRI. [R. 511]. The MRI was severely degraded by motion. The alignment in the thoracic spine showed no significant listhesis. *Id*. There was no focal abnormality in the vertebral body bone marrow height and signal. *Id*. The intervertebral disc spaces showed preservation of height. *Id*. There was no evidence of cord compression and the CSF dorsal and ventral were preserved. *Id*. The axial images of the cervical spine showed the following levels of pathology: at C4-C5 there was a mild facet and uncovertebral hypertrophy producing mild narrowing of the right neural foramen. *Id*. At C6-C7 there was mild uncovertebral hypertrophy. *Id*. At C7-T1 there was facet and uncovertebral hypertrophy producing mild left-sided neural foraminal stenosis. *Id*.

On January 30, 2012, Plaintiff was admitted to the emergency room at Palm Springs General Hospital. Plaintiff presented to Dr. Maray Rocher-Gomez, MD, complaining of chest pain. [R. 440]. He was discharged on January 31, 2012. [R. 441]. Plaintiff was diagnosed upon discharge with chest pain, hypertension, and hyperkalemia. *Id*. A chest x-ray revealed cardiomegaly. *Id*. He was placed on aspirin 81 daily, 25 milligrams of metoprolol daily, a nitro patch chest wall q cardiac enzyme q8 times 3. *Id*. Dr. Juan Sarol, MD, conducted a 24 hour telemetry study. [R. 445]. The telemetry study was normal without arrhythmia, and there was no bradycardia. *Id*. Plaintiff had no congestion, blurred vision, shortness of breath cough or sputum

production; no edema, calf tenderness or cyanosis; and no ulcers or lesions, or rash. *Id*. Plaintiff underwent several tests and all came back normal. [R. 446].

Plaintiff's condition improved during the course of hospitalization, and by January 31, 2012, he was doing much better. [R. 441]. Plaintiff's vital signs were stable, and he was afebrile with no chest pain or shortness of breath. *Id*. Plaintiff was awake and alert and in no acute distress. *Id*. Plaintiff tolerated medications and diet well. *Id*. Plaintiff was discharged home medically stable with instructions. *Id*. Plaintiff was instructed to keep a low-cholesterol, low-sodium diet, refrain from strenuous activities, and to follow up within a week. [R. 442]. He was also sent home with Pravastatin, and Metoprolol. *Id*.

On February 9, 2012, Plaintiff presented to the Emergency Room at Palmetto General Hospital complaining of chest pain. [R. 514]. Plaintiff told physicians that the chest pain was located primarily in the anterior chest wall. *Id*. The onset of the pain was gradual. *Id*. Plaintiff stated that the pain radiated to the left arm and left shoulder, and he described the pain as pressure. *Id*. A cardiovascular exam was positive for chest pain and negative for orthopnea. *Id*. Plaintiff was given Percocet and acetaminophen. [R. 517]. Plaintiff's preliminary diagnosis was chest pain and acute coronary syndrome. *Id*. The physician noted that Plaintiff had a past medical history of hypertension. [R. 521]. The physician ordered a serial cardiac enzyme as well as an echo with Doppler. *Id*. All results came back negative. *Id*. At the time of admission, Plaintiff said he had a numbness sensation in the left upper extremity. *Id*. The physician ordered a CT scan, which also came back normal. *Id*. The physician noted that Plaintiff was stable and asymptomatic, and the physical examination was completely unremarkable. *Id*. The physician sent Plaintiff home to continue with the same medication he was taking. *Id*.

On February 20, 2012, Plaintiff presented to Palmetto General Hospital, complaining of

dizziness and back pain. [R. 503-4]. Plaintiff presented with pain that was acute, with no known mechanism of injury. *Id*. He stated that the pain did not radiate. *Id*. The notes state that, at their worst, Plaintiff's symptoms were moderate. *Id*. Plaintiff stated that many tests were done when he was at the hospital the week prior, but he still has back pain. *Id*. Plaintiff stated that he wanted the pain resolved and wanted to see an orthopedic doctor. *Id*. Plaintiff stated that he was taking aspirin and lorazepam daily, and Tricor nightly. *Id*. The physician noted that Plaintiff was well-developed, well-nourished, and awake, alert, and in no acute distress. [R. 505]. Plaintiff was discharged in stable condition. [R. 506]. The physician's impression was that Plaintiff suffered from a muscle spasm. *Id*.

On March 13, 2012, Plaintiff presented to UHealth Advanced Institute for Pain Management and Physical Medicine and Rehabilitation. [R. 746]. He saw Dr. Robert Irwin, M.D. for back pain. *Id*. Dr. Irwin noted that Plaintiff had possible cervical stenosis without myelopathy and ordered physical therapy for the shoulder and for Plaintiff to return to the clinic in eight weeks. [R. 751]. Plaintiff began attending physical therapy on March 26, 2012. [R.745]. On April 17, 2012 he returned to the clinic to see Dr. Irwin. [R. 728]. Plaintiff underwent an ultrasound guided left shoulder injection. [R. 731]. Plaintiff said physical therapy did not help. [R. 733]. Dr. Irwin wrote that Plaintiff probably suffered a left Labral tear and ordered an MRI of the left shoulder with an arthrogram. *Id*.

On August 9, 2012, Plaintiff returned to Dr. Irwin for a follow up. [R. 583]. Plaintiff was diagnosed with pain in the joint and shoulder region, and he listed the following problems: neck, back, and shoulder pain, anxiety, chest pain, disorders of bursae and tendons in shoulder region, left rotator cuff tear, and pain in joint in shoulder region. *Id*. Plaintiff reported taking acetaminophen, lorazepam, metoprolol, simvastatin, and aspirin. [R. 586]. Dr. Irwin prescribed

Percocet and tramadol. *Id.* Dr. Irwin ordered an x-ray of the cervical spine. *Id.* Dr. Irwin noted that there was questionable minimal disc space narrowing noted at the level of C5-C6 versus tilt, and no evidence of spondylolisthesis. [R. 587]. Plaintiff received a subcromial bursa injection via ultrasound guidance on August 1, 2012, but Plaintiff reported to Dr. Irwin that he only got about two hours of relief from the injection. *Id.* Plaintiff also told Dr. Irwin that he sought treatment in the emergency room for his pain in the left shoulder. *Id.* At that visit, he received an injection of Norflex, Toradol, and Percocet, and he stated that he received little relief. *Id.*

Plaintiff complained to Dr. Irwin of recurrent pain in his shoulder, rated as 6/10 in intensity at best and 8-9/10 intensity at worst, extending form the upper trapezius region into the triceps region at the left upper extremity. *Id.* Plaintiff told Dr. Irwin that he found little relief of pain with any medication and felt the pain was getting worse. *Id.* Dr. Irwin reported that Plaintiff cannot take anti-inflammatories because it raises his blood pressure. *Id.* Dr. Irwin stated that Plaintiff was oriented to person, place and time, and he appeared well-developed and well-nourished. [R. 590]. Dr. Irwin stated that Plaintiff's gait and station were normal, and there was full ROM in bilateral UE. *Id.* There was no evidence of subluxation, effusion, dislocation, or bony abnormality in bilateral UE. *Id.* Special testing on the left shoulder revealed a positive lift off test, decreased strength on external rotation and tenderness over the biceps tendon. *Id.* Dr. Irwin reported that forward flexion of the cervical spine did not cause any increase in pain, but extension of the vertical spine did reproduce Plaintiff's reports of pain. *Id.* Dr. Irwin also noted that Plaintiff had a normal sensation to light touch, and his mood and affect were normal. *Id.* Dr. Irwin was concerned there was a partial tear of the infraspinatus tendon and fraying of the biceps tendon as reported on the MRI. *Id.* Dr. Irwin also noted concomitant concern for possible neurologic involvement. *Id.*

Dr. Irwin noted that his plan was to do an EMG/NCS to evaluate for possible nerve root impingement, TOS, or plexopathy or other nerve syndromes. *Id.* He also noted that he wanted to take an x-ray with flexion and extension, and start a trial of tramadol. *Id.*

On August 13, 2012, Plaintiff was seen at Hialeah Hospital, complaining of chest and back pain. [R. 413]. Plaintiff reported that the chest pain was located primarily in the anterior chest wall, and the pain did not radiate. [R. 414]. Plaintiff described the chest pain as achy. *Id.* Plaintiff reported multiple episodes that had resolved. *Id.* He reported that the symptoms were alleviated by nothing and aggravated by nothing. *Id.* Plaintiff stated that at its worst, the pain was moderate. He also reported that the pain is unchanged despite home interventions. *Id.* The notes reflect that Plaintiff's eyes were negative for injury, pain, redness, and discharge. *Id.* Notes also reflect that Plaintiff appeared in no acute distress, and was alert, awake, and comfortable, with a normal gait. [R. 416]. The hospital administered tests and Plaintiff was given aspirin in the emergency department. [R. 417]. Plaintiff was discharged and diagnosed with chest pain and adjustment disorder with anxiety. [R. 418]. The doctors determined that his condition was stable and ordered him to follow up with a private physician. *Id.*

On August 15, 2012, Plaintiff returned to UHealth Advanced Institute for Pain Management for a follow-up visit with Dr. Irwin. [R. 575]. He presented with recurrent complaints of pain in the left shoulder, rated as a 6/10 in intensity at best and an 8-9/10 in intensity at worst extending from the upper trapezius region into the triceps region at the left upper extremity. *Id.* Plaintiff stated that he found little relief with any medications and felt that the pain was getting worse. *Id.* The physician noted that Plaintiff's gait and station were normal, and there was full ROM in the bilateral UE. [R. 577]. The physician noted that there was no evidence of any subluxation, effusion, dislocation, or bony abnormality in the bilateral upper

extremity. *Id*. Special testing at the left shoulder revealed a positive empty can test, positive lift off test, decreased strength on external rotation and tenderness over the biceps tendon. *Id*. Plaintiff came in on August 15, 2012 for an electromyography, but he could not tolerate it. [R. 578]. An MRI of Plaintiff's neck was normal with only mild congenital stenosis without compromise. *Id*. An MRI of the shoulder showed a small tendinopathy and small infraspinatus tear, but there was no response to injection. *Id*. The physician noted that Plaintiff was hyperpathic. *Id*.

On August 22, 2012, Plaintiff presented to Palmetto General Hospital. [R. 482]. He complained of right arm numbness and tingling. [R. 482]. Plaintiff reported that the problem was sustained at home, possibly resulting from eating. [R. 482]. Plaintiff reported that the symptoms began acutely. *Id*. Plaintiff stated that there was numbness, tingling, cold lower extremities, decreased range of motion, and deformity. *Id*. The severity of the symptoms resolved in the emergency room. *Id*. The physician noted that Plaintiff was awake, alert, and in no acute distress. [R. 484]. Plaintiff was given Percocet and Ativan. [R. 486]. The physician noted that Plaintiff suffered an acute myofascial strain and an anxiety reaction. *Id*. He was prescribed Vicoprofen. *Id*.

Plaintiff presented to the emergency room at Palm Springs General Hospital on August 23, 2012, for chest pain. [R. 454]. Plaintiff was hypertensive. *Id*. Plaintiff's cardiac enzymes were negative times three, his electrolytes were unremarkable, and his clinical toxicology screening was negative. *Id*. Further, Plaintiff's SMA 7 and urinalysis were unremarkable. *Id*. A chest x-ray revealed no acute cardiopulmonary process. [R. 455]. The echocardiogram was within normal limits, and the EKG was in sinus rhythm. *Id*. Plaintiff was given supplemental 02, Ambien, Tylenol, nitrates, and Clonidine. *Id*. Plaintiff was ruled out for myocardial infarction.

*Id.* Plaintiff was diagnosed with chest pain, hypertension, and anxiety, and was discharged the following day. *Id.*

On August 24, 2012, Plaintiff was admitted to the emergency room at Palm Springs General Hospital. [R. 437]. He complained of chest pain. *Id.* He was discharged the same day to home self-care. *Id.*

On August 29, 2012, Plaintiff returned to UHealth Advanced Institute for Pain Management and saw Dr. Chaturani T. Ranasinghe, M.D. for a follow-up visit. [R. 567]. Dr. Ranasinghe ordered an MRI of the left brachial plexus plain and with GAD because of Plaintiff's left shoulder pain, left hand weakness, possible Thoracic outlet syndrome, and because he was unable to tolerate the EMG. *Id.* Dr. Ranasinghe also gave Plaintiff a referral to an Orthopedic Surgeon. *Id.* Plaintiff told Dr. Ranasinghe that he was in a motor vehicle accident in 2011 and he had a fall later that year. [R. 571]. He told the physician that he was pinned in the car between a concrete column and the car, and since then he has had pain in his shoulder. *Id.* He said that he fell in November of 2011 due to the pain in his shoulder. *Id.* Plaintiff told the physician that he was taken to Kendall Regional and had a full cardiac workup including catheterization. *Id.* Plaintiff reported that the pain occurs throughout the day whenever he attempts to move. *Id.* He also described episodes of increased anxiety during pain attacks as well as pain and weakness in the opposite arm and shoulder and bilateral legs, diaphoresis and headache. *Id.* Plaintiff reported that his symptoms were aggravated by any type of movement. *Id.*

Imaging showed insertional rotator cuff tendinosis, with focal low grade articular surface partial thickness tear of the infraspinatus tendinous insertion. *Id.* There was no full thickness rotator cuff tendon tear evident. *Id.* The long head of the biceps tendinitis with partial thickness tendon fraying of the intraarticular portion at the level of rotator cuff interval was without

14

complete tendon rupture. *Id.* The biceps tendon was anatomically situated. [R. 572]. The physician noted that there was minimal degeneration of the right superior labrum and no evidence of discrete labral tear. *Id.*

On August 30, 2012, Plaintiff presented to Palmetto General Hospital. [R. 468]. His chief complaint was arm numbness, and he also complained of arm pain, chest pain, epigastric pain, upset stomach, and palpitations. [R. 468-469]. Plaintiff told the physicians that he was in a motor vehicle crash in 2011 and injured his left shoulder. [R. 469].Plaintiff stated that he was scheduled to have an MRI at the University of Miami in one month's time. *Id.* He complained of chest pains, where the pain in his shoulder radiated to the pain in his left chest. *Id.* The records state that Plaintiff was seen at University of Miami on August 30, 2012, that same day, and was told that he was going to have his MRI in September of 2012, and he would see a surgeon. *Id.* Plaintiff stated that he was taking a lot of medications for the pain and they were causing his stomach to be upset. *Id.* Plaintiff then said that the only medication he took for the pain was Tylenol and it is not working. *Id.* The physician noted that Plaintiff was "not a good historian" and when he tried to ask Plaintiff questions, Plaintiff "heads down another path with more problems." *Id.* The physician noted that the pain was moderate in the emergency room. *Id.* The physician stated that he is "not sure exactly why" Plaintiff was in the hospital, but it appeared that he had pain and his stomach was upset. *Id.* Plaintiff was very anxious. *Id.* The physician noted that he felt that there was a significant psychological component to Plaintiff's problems. *Id.* Plaintiff appeared to be in no acute distress, and was alert, awake, comfortable, non-diaphoretic, non-toxic, well-developed, well hydrated, well groomed, and well nourished. [R. 471]. His mood was cooperative, anxious, and his affect was calm, oriented to person, place and time. [R. 472].

On April 11, 2013, Plaintiff presented to Dr. Seth Williams, MD, at the UMHC Sylvester Spine Institute for his back and shoulder pain. [R. 630]. Dr. Williams noted that Plaintiff told him he received injections in Cuba that provided dramatic but short-term relief. *Id.* There was concern that there might be cervical spine involvement with Plaintiff's pain. *Id.* Plaintiff told Dr. Williams that his left arm felt numb and he avoided using his left arm due to the pain. [R. 634]. Plaintiff told Dr. Williams that he smoked five cigarettes per day. *Id.* Dr. Williams reviewed Plaintiff's MRI and found mild congenital stenosis, slight effacement of the spinal cord at C3-C4, and otherwise, no impingement of the spinal cord and no foraminal stenosis. *Id.* Dr. Williams' differential diagnosis included intrinsic shoulder pathology, myofascial pain syndrome, complex regional pain syndrome, peripheral compressive neuropathy, and brachial neuritis such as Parsonage-Turner syndrome, much less likely cervical radiculopathy given the presentation and the imaging studies. *Id.* Dr. Williams did not recommend any interventions with respect to the neck. *Id.* He recommended that Plaintiff gather his records from Cuba and bring the records to Dr. Irwin. *Id.* He also suggested that further attempts be made at the treatment of the shoulder, with consideration for nerve conduction studies if Dr. Irwin thought it appropriate. *Id.*

Plaintiff presented to Hialeah Hospital on May 5, 2013. [R. 601]. Plaintiff's chief complaint was that his left upper back radiated pain to his front. *Id.* The physician noted that Plaintiff sustained the injury at home, and resulted from an unknown reason. [R. 602]. Plaintiff reported no decreased range of motion, and no obvious deformity. *Id.* Plaintiff stated that the pain was aggravated by lifting weight and movement and was alleviated by remaining still. *Id.* The physician wrote that Plaintiff appeared alert, awake, and anxious. [R. 603]. The physician's impression was that Plaintiff suffered a shoulder sprain. [R. 605]. Plaintiff was discharged and

prescribed Motrin, Robaxin, and Lortab. *Id.* Plaintiff was ordered to follow up with Dr. Juan Puerto in order to recheck Plaintiff's complaints and progress with the shoulder sprain. [R. 605].

Plaintiff was seen by Dr. Lourdes E. Pola, Ph.D. for a General Clinical Evaluation with Mental Status on May 21, 2013. [R. 607]. Plaintiff was referred by J. Jones, Medical Disability Adjudicator. Plaintiff told Dr. Pola that he last worked in 2012 when he started having shoulder pain. [R. 608]. Plaintiff told Dr. Pola that he was carrying boxes from the freezer to the oven area and suddenly started having sharp pain. *Id.* Since then, Plaintiff said that he has suffered from chronic pain that radiates to the back and chest and from hypertension. *Id.* Plaintiff reported that he was being treated by Claudia Bermudez, a cardiologist. *Id.* He also stated he was taking metoprolol. *Id.*

Plaintiff denied surgeries and accidents. [R. 609]. Plaintiff reported that he could be calm and suddenly become anxious, begin pacing, and exhibit shortness of breath, hand shaking and sweating. *Id.* Plaintiff stated that he went to a psychiatrist in Cuba and was prescribed several medications that he took until he was able to see a psychiatrist in Miami. *Id.* Plaintiff told Dr. Pola that he was hospitalized in a psychiatric hospital as a child because of anxiety and agitated behavior. *Id.* Plaintiff reported that he takes Clonazepam. *Id.* Plaintiff stated that when he runs out of medication he goes to the emergency room to get more pills. *Id.* He also stated that he sleeps during the day because the medication makes him drowsy. *Id.* Plaintiff also told Dr. Pola that he smokes three packs of cigarettes per day. *Id.*

Dr. Pola reported that Plaintiff is independent for daily living skills. *Id.* He raises pigeons and takes care of birds. *Id.* He sometimes washes the dishes. *Id.* Plaintiff said that he used to cook and clean but now he cannot because of the pain. *Id.* Plaintiff drives and spends most of the day at home sleeping and watching TV. *Id.* Plaintiff told Dr. Pola that he does not do much

17

socially. *Id.* He does not have friends but gets along with family members. *Id.* He talks to his neighbors and sometimes takes his sons to the park. *Id.* His youngest son lives with him and his older son visits every other weekend. *Id.*

Dr. Pola observed that Plaintiff was appropriately dressed and groomed, and his gait was unremarkable. [R. 610]. Plaintiff walked without the assistance of an ambulatory device. *Id.* Eye contact was appropriate. *Id.* Plaintiff wore reading glasses. *Id.* His speech was unremarkable and he spoke in a coherent manner. *Id.* Dr. Pola stated that Plaintiff's thoughts were very tangential and his thought process was preservative. *Id.* Dr. Pola stated that he complained constantly about his medical problems and pain, and when he was asked a question unrelated to his medical condition, he would "give minimal information and return to the topic of the pain." *Id.* Dr. Pola reported that Plaintiff was cooperative, and there were no signs of bizarre behavior or delusion *Id.* Plaintiff reported hearing voices and nightmares. *Id.* Dr. Pola did not detect a thought disorder. *Id.*

Dr. Pola noted that Plaintiff's mood was anxious, and his affect was congruent with his mood. *Id.* He talked constantly, giving details about his medical problems and medications. *Id.* Plaintiff denied homicidal and suicidal thoughts, but reported that his shoulder pain was so bad a few days prior that he "banged his shoulder against the wall." *Id.* Dr. Pola reported that Plaintiff was alert and oriented to person, place, and purpose, although he was confused about the month, and thought it was April instead of May. [R. 611].

Dr. Pola stated that Plaintiff's memory is fair and his concentration is poor. *Id.* Dr. Pola noted that she thought Plaintiff's fluctuations in attention and concentration appeared to be due to his anxiety during the examination. *Id.* In conclusion, Dr. Pola stated that she found Plaintiff to be suffering from Generalized Anxiety Disorder. *Id.* She stated that his intellectual function is

18

estimated to be in the low average range. *Id*. She opined that he was able to handle his finances. *Id*.

On May 22, 2013, Plaintiff was seen by Dr. Pierre Richard Edouard, M.D., for a physical exam and report on initial range of motion. [R. 617]. Plaintiff told Dr. Edouard that he was diagnosed with cervical stenosis and thoracic scoliosis, and treated conservatively with epidural steroids injection and pain killers. *Id*. Plaintiff told Dr. Edouard that he participated in physical therapy with minimal improvement. *Id*. He complained of neck, lower back, left arm, and left shoulder pain. *Id*. Plaintiff reported that he was recently diagnosed with hypertension and hypercholesterolemia. *Id*. He said he complies with his medications and adheres to a low salt diet. *Id*. He also reported that he was recently diagnosed with depression. *Id*. He complained that he cannot sleep and only sleeps four hours per night. *Id*.

Plaintiff reported that he is married with two children, and he smokes one pack of cigarettes per day. [R. 618]. During the exam, Plaintiff was conscious, alert, coherent, and oriented to person, place, and time. *Id*. Plaintiff had no difficulty getting on and off the table. Plaintiff's eyesight was 20/25 in the right eye and 20/20 in the left eye, without glasses. *Id*. Plaintiff's grip strength was 5/5 on the right hand and 4/5 on the left. [R. 620]. Plaintiff was able to button his shirt and turn the knob to open the door. *Id*. His leg strength was 5/5 for right leg and 5/5 for the left leg. *Id*. His range of motion appeared normal except that the supine and seated straight leg tests disclosed pain at 60 degrees bilaterally. [R. 621]. He was able to toe and heel walk. *Id*. Gait was normal *Id*. He needed no assisting devices to ambulate. *Id*. There was scoliosis, but no kyphosis apparent. *Id*.

Plaintiff returned to Dr. Irwin at UNHC Sylvester Outpatient Department of Rehabilitation Medicine on June 27, 2013. [R. 623]. This time, Plaintiff complained of weakness

of both legs and dizziness. [R. 626]. Dr. Irwin noted that Plaintiff's gait and station appeared normal, and there was full ROM in bilateral upper and lower extremities. [R. 629]. Dr. Irwin wrote that there was 5/5 strength throughout Plaintiff's bilateral upper and lower extremities, including quadriceps, ankle dorsiflexion, and plantar flexion, EHL and knee flexors. *Id*. Dr. Irwin noted there was no evidence of any subluxation, effusion, dislocation, or bony abnormality in the upper and lower extremities. *Id*. He noted it was tender in the trapezius bilaterally. *Id*. Dr. Irwin diagnosed myofascial pain and headaches. *Id*.

On July 12, 2013, Plaintiff saw Dr. Nida Usmani, M.D. at the fast track neuromuscular clinic at UHealth Advanced Institute for Pain Management. [R. 662]. Plaintiff complained of a sharp shooting pain radiating down from neck to left hand for the past year and a half, after a motor vehicle accident. *Id*. Dr. Usmani noted that Plaintiff had limitation of neck rotation to the left, and decreased bulk of left deltoid and decreased sensation in the left axillary nerve distribution. *Id*. She noted the pain could be secondary partial rotator cuff injury or a brachial plexopathy with axillary nerve involvement. [R. 663]. She advised Plaintiff to have an EMG/NCS to evaluate for left brachial plexopathy, consider getting an MRI to evaluate for cervical spine disease given limitation of neck ROM, and to continue physical therapy and use tramadol for pain. *Id*. Plaintiff underwent a Motor Nerve Convention Study at the clinic on August 30, 2013. [R. 664]. The studies were normal, but had to be interrupted because of patient's poor tolerance to the procedure. *Id*.

On March 5, 2014, Plaintiff presented to UHealth Advanced Institute for Pain Management Physical Medicine and Rehabilitation. [R. 791]. Plaintiff saw Dr. Jose Mena, M.D., and was diagnosed with fibromyalgia. *Id*. Dr. Mena prescribed Lyrica. [R. 794]. Dr. Mena noted that Plaintiff had a history of back and neck pain, which occurred insidiously, and not related to

any trauma or accident. *Id.* He noted that Plaintiff has seen multiple providers and undergone multiple medical imaging studies and workups. *Id.* Everything has been negative. *Id.* Dr. Mena found Plaintiff's MRI to be unremarkable and his EMG was negative for any nerve lesion. *Id.* Dr. Mena noted that Plaintiff still persists with pain and feels fatigued and tired, as well as depressed and anxious. *Id.* Dr. Mena found that Plaintiff has a generalized pain syndrome, likely related to fibromyalgia. *Id.* Dr. Mena recommended that Plaintiff see Dr. Ference for fibromyalgia management and evaluation. *Id.*

Plaintiff saw Dr. Tamar S. Ference, M.D. on July 22, 2014. [R. 782]. Dr. Ference reported that Plaintiff has had generalized pain all over for the past three years, beginning in October of 2011. [R. 284]. Dr. Ference noted that Plaintiff has intermittent numbness, and his pain worsens with all physical activities, and his pain improves when lying down. *Id.* Dr. Ference wrote that Plaintiff's pain flares required him to go to the ER for treatment for the pain. *Id.* According to Dr. Ference, Plaintiff has tried ibuprofen and tramadol but they did not help. *Id.* Plaintiff told Dr. Ference that he did not take Lyrica, which was prescribed, because it was not covered by his insurance, and he did not take Effexor because it was not covered by insurance. *Id.* Plaintiff tried physical therapy for one month in 2012 but it did not help. *Id.* Dr. Ference noted that Plaintiff has associated anxiety and depression. *Id.* Plaintiff told Dr. Ference that he takes clonazepam to sleep. *Id.* Dr. Ference's impression was that Plaintiff suffered from fibromyalgia and chronic fatigue syndrome. [R. 786]. He prescribed Cymbalta and a follow up in 8 weeks. *Id.*

Plaintiff presented to Dr. Ference on February 24, 2015. [R. 772]. Dr. Ference noted that Plaintiff's pain is constant and aching, burning, and intermittently sharp. [R. 778]. Dr. Ference renewed Plaintiff's prescription for flexeril and advised Plaintiff to start physical therapy and

aquatic therapy three times a week. *Id.* Dr. Ference also started Plaintiff on Prilosec and increased his prescription for tramadol. *Id.*

Dr. Ference evaluated Plaintiff again on March 13, 2015. [R. 763]. Plaintiff described his pain as aching, burning, and intermittently sharp. *Id.* He rated his pain during the visit as an eight out of ten, and said the pain is constant. [R. 768]. Plaintiff told Dr. Ference that he had intermittent numbness in his lower extremities, and that his pain worsens with all physical activities, including walking and standing. *Id.* Dr. Ference noted during the physical examination that Plaintiff's motor strength in the upper and lower extremities was 4/5. *Id.* Plaintiff's sensations were intact to light touch and balance and gait were normal. [R. 769]. Dr. Ference ordered a Medrol dose pack, toradol, and Lyrica. *Id.* Dr. Ference also ordered Plaintiff to continue Prilosec, flexeril, and tramadol. *Id.*

On April 1, 2015, Dr. Tamar Ference completed a treating source statement regarding Plaintiff's fibromyalgia. [R. 676]. According to Dr. Ference, Plaintiff suffers from: history of widespread pain for three or more months; pain in eleven or more pressure points; stiffness; paresthesias; sleep disturbance; chronic fatigue; memory loss; and inability to ambulate effectively. *Id.* Dr. Ference opined that Plaintiff cannot work any hours per day, can stand for fifteen minutes at one time, can stand for thirty minutes in a work day, can sit for thirty to sixty minutes at a time, can never lift on an occasional or frequent basis, and can never bend, stoop, or raise either arm over his shoulder level. *Id.* Dr. Ference also noted that Plaintiff cannot work at all due to his severe pain and fatigue, decreased concentration, and difficulty sleeping. Dr. Ference added that Plaintiff's medical conditions interfere with his physical related activities of daily living. [R. 677].

On April 24, 2015, Plaintiff presented to Dr. Martha Kato, MD, at UHealth Physicians at

Boca Raton, for his anxiety. [R. 864]. Dr. Kato noted that Plaintiff had generalized anxiety that appeared intermittently and lasted for weeks. *Id.* She noted that Plaintiff appeared well-groomed. *Id.* Plaintiff told Dr. Kato that he was taking Klonapin as needed. [R. 865]. Plaintiff told Dr. Kato that he wanted to continue with that medication because he felt that it was the only medication that helps. *Id.* Plaintiff told Dr. Kato that his depression has improved after he was diagnosed with fibromyalgia and has better pain control. *Id.* Plaintiff told Dr. Kato that he did not want to take anti-depressants because they made him feel worse. *Id.* Dr. Kato advised Plaintiff to continue walking and to wean off of caffeine. *Id.* She continued his prescription for Klonapin. *Id.* Dr. Kato diagnosed Plaintiff with generalized anxiety disorder. *Id.*

Plaintiff returned to Dr. Kato on May 18, 2015 for a check-up. [R. 860]. Plaintiff reported feeling sad and anxious. [R. 861]. He agreed to begin taking Effexor XR, an antidepressant. *Id.* Dr. Kato prescribed the Effexor XR and also advised Plaintiff to get more exercise. *Id.* Dr. Kato completed a medical assessment of Plaintiff's ability to do work-related activities on May 18, 2015. [R. 678]. She found that Plaintiff's abilities to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stress; function independently; and maintain attention and concentration were poor. *Id.* Dr. Kato also found that Plaintiff's abilities to remember and carry out complex job instructions, to understand, remember and carry out detailed, but not complex job instructions, and to understand, remember, and carry out simple instructions were poor. [R. 679]. She found that his ability to maintain his personal appearance was fair. *Id.* She also found that his abilities to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were poor. *Id.* Dr. Kato wrote that Plaintiff has severe anxiety and is unable to deal with any stress. *Id.* She concluded that Plaintiff was unable to do any type of work. *Id.*

23

Plaintiff presented again to Dr. Ference on June 9, 2015. [R. 760]. Plaintiff told Dr. Ference that his pain was a 7/10 at the time of the examination, and the pain was a stabbing pain, worst in the right lower back. *Id.* Plaintiff had fallen three weeks prior and visited the ER. *Id.* Dr. Ference again prescribed Lyrica, Prilosec, and tramadol, and he increased Plaintiff's dose of flexeril. [R. 761].

V. Martinez completed a Disability Report for Plaintiff on March 27, 2013. [R. 291]. Martinez reported that Plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing. [R. 292]. Plaintiff filled out an Adult Disability Report on March 27, 2013. [R. 294]. Plaintiff stated he had back and left arm pain and depression. [R. 295]. Plaintiff wrote that he stopped working on March 1, 2012 because of his condition. *Id.* Plaintiff did not complete the entire form and left several questions blank.

Plaintiff completed a supplemental pain questionnaire on April 5, 2013. [R. 306]. Plaintiff said that the pain in his shoulder radiates all through his chest and arms and is a 10/10 for pain. *Id.* Plaintiff stated that reaching, lifting any kind of weight and extreme temperatures make his pain the worst. *Id.* Plaintiff stated that he experiences pain 6 to 8 times per day every day. *Id.* He stated that ice, sitting or lying down, and pain medications help with the pain. *Id.* Plaintiff said he had several side effects from his medication, including anxiety, headache, depression, tiredness, heart burn, fatigue, blurry vision, joint pain and sleeplessness. [R. 307]. Plaintiff said he attended physical therapy sessions for 8 months but he did not get the outcome he expected. *Id.* Plaintiff stated that he was unable to cook meals, and he needs assistance with personal care because bending or reaching causes him too much pain. *Id.* He also said that he cannot do housecleaning, laundry, or shopping because it triggers his pain. *Id.* Plaintiff said he

can only sleep for 2 – 3 hours at a time. *Id.* He did say that he was able to drive for a short period of time because he adjusts the seatbelt to a comfortable position. *Id.* Plaintiff added that he cannot perform yard work or gardening, and he cannot partake in social activities or hobbies. [R. 308]. Plaintiff said he is able to take care of his children as long as it does not involve cooking or bathing. *Id.* Plaintiff said he cannot perform home maintenance. *Id.* Plaintiff also said that he can sit but he has to change positions frequently. *Id.* Plaintiff said he can walk but only for short periods of time. *Id.* He said he cannot perform his job as a baker due to the unbearable pain and fatigue. [R. 209]. Plaintiff also said he has severe anxiety due to the pain, and depression because he has not found a cure for his problem. *Id.* Plaintiff added that he goes to the ER at least 5 times per month when his medications stop working. *Id.*

Plaintiff filled out a second Function Report on April 10, 2013 [R. 319], and a second Disability Report on August 13, 2013. [R. 327]. Plaintiff said the pain worsened and his limitations increased. [R. 328]. Plaintiff said that his panic attacks and depression has worsened because he does not see a solution to the pain, and it is difficult to get his medicine. *Id.* He filled out another pain questionnaire on August 29, 2013. [R. 338]. Plaintiff completed another function report on August 29, 2013, and gave the same answers as the April function report. *See* R. 343-350.

On February 22, 2014, Plaintiff completed another Disability Report, and stated that his condition had worsened and caused more visits to the emergency room. [R. 355]. He said the pain causes his blood pressure to increase, and he believes he is having a heart attack. [R. 360]. This causes him severe anxiety. *Id.* Plaintiff said he was in a deep depression. *Id.* He wrote that he started a new job doing delivery with his own car, but the pain and fatigue were too much and he had to resign. *Id.* Plaintiff said his wife has to handle every activity including his personal

care. *Id.* He added that he was especially frustrated because the doctors could not tell him what was wrong with him. [R. 361].

In the Disability Determination Explanation, L. Clark, Ph. D., conducted a consultative examination of Plaintiff. [R. 78]. Dr. Clark found that at the time of the examination, Plaintiff was conscious, alert, coherent, and oriented to person, place and time. *Id.* Plaintiff was cooperative and not in acute distress. *Id.* Plaintiff's vision was 20/25 in the right eye and 20/20 in the left eye. *Id.* Plaintiff's heart was in regular rhythm, and there was cardiomegaly. [R. 79]. Dr. Clark noted that there was no murmur, the lungs were clear, and the examination of the abdomen was normal. *Id.* He also noted there was scoliosis but no kyphosis apparent. *Id.* Plaintiff's grip strength was 5/5 in the right hand and 4/5 in the left hand. *Id.* Plaintiff's fine manipulation was normal. *Id.* Dr. Clark noted tenderness to palpation over the left shoulder joint line. *Id.* Plaintiff was able to button his shirt and to turn the knob to open the door. *Id.* Dr. Clark found 5/5 leg strength in both of Plaintiff's legs. *Id.* Plaintiff's supine and seated straight leg raise tests disclosed pain at 60 degrees bilaterally, and Plaintiff was able to toe and heel walk. *Id.* Plaintiff's gait was normal and he didn't need any assistance in ambulating. *Id.* Dr. Clark found that Plaintiff's arthropathies and anxiety disorders were both severe. *Id.* However, he found that the anxiety disorder caused only mild restrictions of daily living, moderate difficulties in social planning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. [R. 80]. Dr. Clark assessed Plaintiff's symptoms and credibility and found that one or more of the impairments could reasonably be expected to produce Plaintiff's pain or symptoms, but that Plaintiff's statements about the intensity, persistence, and limiting effects of the symptoms were not substantiated by the objective medical evidence. *Id.* Dr. Clark found Plaintiff to be only partially credible, because Plaintiff reported

independent activities of daily living, raising pigeons, and driving. [R. 80-81].

In determining Plaintiff's Residual Functional Capacity Assessment ("RFC"), Jessica Jones, SDM, found that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand for six hours in an eight hour day, and sit for six hours in an eight hour day. [R. 81]. She found that Plaintiff could push or pull with the same limitations as lifting and carrying. *Id.* She stated that Plaintiff could climb ramps and starts, ladders, ropes, and scaffolds occasionally. [R. 82]. According to Ms. Jones, Plaintiff could balance an unlimited amount and stoop, kneel, crouch, and crawl occasionally. *Id.*

Dr. Clark considered Plaintiff's Mental RFC and found that Plaintiff did not have understanding and memory limitations, but did have sustained concentration and persistence limitations. [R. 83]. Dr. Clark only found Plaintiff to be moderately limited in the ability to maintain attention and concentration for extended periods; in the ability to work in coordination with or in proximity to others without being distracted by them; in the ability to interact appropriately with the public; and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. [R. 83-83]. The assessors found that Plaintiff was limited to unskilled work and demonstrated the maximum sustained work capability for light work. [R. 85]. They also found that Plaintiff could perform the following occupations: cleaner, table worker, or nut sorter. [R. 86].

Upon reconsideration, the SSA again found Plaintiff not disabled and entered a second Disability Determination Explanation. [R. 104]. Here, the SSA found that Plaintiff's unspecified arthropathies, dysfunction of major joints, spine disorders, and anxiety disorders were all severe. [R. 111]. Dr. Ronald Chase, M.D., found that Plaintiff did not meet the criteria required for the psychological impairments. *Id.* Dr. Chase found that Plaintiff's anxiety disorder caused mild

restrictions of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. *Id.*

Dr. Sunita Patel, M.D., evaluated Plaintiff's RFC on November 23, 2013, and again found Plaintiff to be partially credible for the same reasons she stated above. [R. 112]. In this evaluation, Dr. Patel found that Plaintiff could only balance occasionally. *Id.* All other limitations remained the same. *Id.* Dr. Patel also stated that Plaintiff had limited reaching on his left side, in front or laterally and overhead. *Id.* Dr. Chase conducted Plaintiff's Mental RFC, and found the same moderate limitations as before. [R. 117-118]. The assessors again opined that Plaintiff was not disabled. [R. 118].

### C. ALJ's Decision

The ALJ issued his decision on Plaintiff's Claim for benefits on November 4, 2015. [R. 25-37]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 26-27]. He found that Plaintiff met the insured status requirement of the Social Security Act through September 30, 2015, and has not engaged in substantial gainful activity since March 1, 2012, the alleged onset date. [R. 27]. The ALJ then found that Plaintiff suffers from the following severe impairments: left rotator cuff tear; mild to slight cervical disk disease; lumbar dysfunction; depressive disorder; anxiety disorder; and fibromyalgia (20 CFR 404.1520(c) and 416.920(c)). *Id.* According to the ALJ, these medically determinable impairments constitute more than slight abnormalities, and could reasonably be expected to have caused more than a minimal effect on the Plaintiff's ability to perform basic work-related activities for a continuous period of 12 months or more. [R. 28]. However, the ALJ found that it was questionable whether Plaintiff satisfied the requirements of Social Security

Ruling 12-2p for fibromyalgia as a medically determinable impairment, because it was not clear that other disorders have been ruled out. *Id.* The ALJ noted there are allegations or evidence of hypertension, cardiomegaly, hypercholesterolemia, vision problems and obesity, but he found that these conditions cause no more than a minimal effect on Plaintiff's ability to perform physical work-related activity. *Id.* The ALJ considered the non-severe impairments in arriving at the Plaintiff's residual functioning capacity. *Id.*

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). *Id.* The ALJ found that Plaintiff's physical impairment of left rotator cuff tear does not meet or medically equal the severity of the criteria in Listing 1.02, because the medical evidence does not show an inability to perform fine or gross motor movements effectively. *Id.* The ALJ also carefully considered fibromyalgia under SSR 12-2p, and obesity within the parameters of SSR 02-01p. *Id.* The ALJ next determined that the severity of Plaintiff's mental impairments do not meet or medically equal the criteria of listings 12.04 and 12.06, as Plaintiff has mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regards to concentration, persistence, or pace, and no episodes of decompensation of an extended duration. [R. 28-29].

After review of the entire record, the ALJ found that Plaintiff has

> the residual functioning capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), such that Plaintiff can lift and carry twenty pounds occasionally, and ten pounds frequently; can stand and walk with normal breaks for six hours in an eight hour workday, and can sit with normal breaks for six hours in an eight hour workday. [R. 30]. Plaintiff can perform no overhead reaching on the left, and no more than frequently reach on the left. *Id.* Plaintiff can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. *Id.* Plaintiff can frequently balance, but only

occasionally stoop, kneel, crouch, or crawl. *Id.* Plaintiff can perform simple, routine tasks and can have occasional and superficial interaction with others, with superficial meaning no negotiation, no confrontation, no arbitration, no mediation, and no supervision of others.

*Id.*

In making this finding, the ALJ attested that he had considered all symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as the opinion evidence. *Id.* The ALJ then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions. [R. 30-31].

The ALJ first summarized Plaintiff's disability reports, pain questionnaires, work history, and function reports. He also summarized Plaintiff's hearing testimony. [R. 32]. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some symptoms, however, the allegations concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. *Id.* The ALJ noted that Plaintiff's medical records do not support a history of anxiety and panic attacks. [R. 31]. The ALJ also found that Plaintiff's allegations of severe pain were inconsistent with his behavior at his hearing, where he sat for more than 30 minutes and appeared fine. [R. 32]. According to the ALJ, the "lack of distress in treatment settings is inconsistent with the allegations of 8-10 level pain." *Id.* The ALJ also pointed out that Plaintiff consistently exhibited normal gait and full range of motion in his joints; save for his left shoulder, which at times also had full range of motion. *Id.*

The ALJ next considered the medical opinions. [R. 33]. He gave great weight to the

30

opinions of Drs. Clark and Chase. The ALJ found that the opinions of Drs. Clark and Chase are generally consistent with the findings of the consultative examinations by Dr. Pola and Dr. Edouard. *Id.* The ALJ noted that although the State agency consultants are non-examining medical sources, the doctors have a high level of understanding of the Social Security disability program and enjoy a review of all the available evidence in the record when forming their opinions. *Id.*

The ALJ gave Dr. Kato's opinion little weight, because "the opinion that the claimant is unable to do any work is a determination reserved for the Commissioner." [R. 34]. Dr. Kato only saw Plaintiff on two occasions, and there was no long term familiarity or opportunity to observe Plaintiff's response to treatment over time. *Id.* Further, the ALJ found that Dr. Kato's opinion was inconsistent with many of Plaintiff's past reports to medical personnel. *Id.*

The ALJ gave some weight to the opinion of Dr. Pola, because her opinion was generally consistent with her examination of Plaintiff and the other objective medical evidence. *Id.*

The ALJ next considered the medical source statement from Dr. Ference, Plaintiff's treating physician. *Id.* The ALJ gave Dr. Ference's opinion little weight, because the opinion that a claimant cannot do any work is an issue reserved to the Commissioner. *Id.* Further, the ALJ noted that the objective medical evidence did not reflect the severity opined by Dr. Ference, who, according to the ALJ, appears to have only relied on Plaintiff's subjective complaints in making his determination. *Id.* The ALJ found that the "limitations described by Dr. Ference are quite extreme and unsupported by any other physician." *Id.* Finally, the ALJ gave significant weight to the opinion of Dr. Patel, who reviewed Plaintiff's medical records in November, 2013 and opined that Plaintiff can perform light work. [R. 34-35].

The ALJ found that Plaintiff is unable to perform his past relevant work as a baker

because the work was classified as heavy, skilled work under the DOT, although Plaintiff performed the work at the medium exertional level. [R. 35]. The ALJ also explained that transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills. [R. 36]. He concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including cleaner and polisher, and plastic mold machine operator. *Id.* The ALJ found that the vocational expert's testimony was consistent with the information found in the DOT. *Id.* The ALJ concluded that Plaintiff has not been under a disability since March 1, 2012, through the date of the decision. [R. 37].

## II.     MOTIONS FOR SUMMARY JUDGMENT

In his *pro se* Motion for Summary Judgment, Plaintiff generally argues that fibromyalgia is "one of the most, if not the worst painful condition any person could ever have" and such a condition makes it so that Plaintiff is "unable to efficiently and normally work to produce money." [DE 18, pg. 2]. Plaintiff states that he cannot work due to his severe fibromyalgia and asks that he be found disabled. *Id.* Additionally, Plaintiff attached to his brief a letter dated August 2017 from Dr. Ference, in which Dr. Ference stated that Plaintiff was permanently disabled and could not work. [DE 18-2].

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment, she asserts that substantial evidence supports the ALJ's decision and the ALJ applied the correct legal standards. [DE 19, pg. 6]. Defendant also argues that Plaintiff waived any intended arguments by not plainly or prominently raising any claim or issue in his brief. *Id.* Finally, Defendant argues that the new

evidence submitted by Plaintiff, namely the letter from Dr. Ference, is not material and does not warrant remand of this case. [DE 19, pg. 9].

### III.   LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F. 2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F. 2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F. 2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must

determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F. 2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

A. Whether the ALJ's analysis of Plaintiff's residual functional capacity complied with the proper legal standards and was supported by substantial evidence

Plaintiff's Motion for Summary Judgment at DE 18 contains unclear statements that do

not raise any claim or issue regarding the ALJ's decision. Defendant argues that Plaintiff waived any intended arguments in his brief by not raising any issues. [DE 19, pg. 6]. However, Plaintiff Suarez is *pro se* in this case. The Court will consider Plaintiff's Motion for Summary Judgment according to the standard for *pro se* parties established by the Eleventh Circuit, which states that "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. U.S.*, 148 F.3d 1262, 1263 (11th Cir. 1998). Applying this standard, the Court liberally construes Plaintiff's Motion to mean that Plaintiff is asserting that substantial evidence does not support the ALJs findings and that the Commissioner committed errors of fact and law. *See* DE 18.

An ALJ is required at step two of 20 C.F.R. § 404.1520 to determine whether the claimant's impairment is severe or not severe. "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work . . . ." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). The Eleventh Circuit Court of Appeals has further explained that, "if no severe impairment is shown [at step two] the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Brown*, 814 F.2d 585, 588 (11th Cir. 1987). As the ALJ continues to steps three, four, and five of the required analysis, the ALJ "is to consider the claimant's entire medical condition, including any impairment or combination of impairments, whether severe or not." *Childers v. Social Sec. Admin., Comm'r*, 521 Fed. Appx. 809, 811 (11th Cir. 2013) (citing *Jamison*, 814 F.2d at 588).

The three-part pain standard requires: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). "When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications; and (5) treatment or measures taken by the claimant for relief of symptoms." *Rogers v. Berryhill*, No. 16-CV-21906, 2017 WL 5634303, at *10 (S.D. Fla. Nov. 6, 2017), report and recommendation adopted sub nom. *Rogers v. Comm'r of Soc. Sec.*, No. 16-21906-CIV, 2017 WL 5598660 (S.D. Fla. Nov. 21, 2017) (quoting *Davis v. Astrue*, 287 Fed.Appx. 748, 760 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1529(c)(3)(i)(vi)).

At step two of the required analysis, the ALJ found that Plaintiff suffers from the following severe impairments: left rotator cuff tear, mild to slight cervical disc disease, lumbar dysfunction, depressive disorder, anxiety disorder, and fibromyalgia. [R. 27]. The ALJ specifically noted that whether Plaintiff satisfied the requirements of Social Security Ruling 12-2p for fibromyalgia as a medically determinable impairment is questionable, because it is not clear that other disorders have been ruled out. [R. 28]. The ALJ gave Plaintiff the benefit of "favorable inferences" drawn from vague evidence in finding that fibromyalgia is a medically determinable severe impairment. *Id.*

The ALJ found that Plaintiff's left rotator cuff tear did not meet or medically equal the severity of the criteria of Listing 1.02, because the medical evidence does not show an inability

to perform fine or gross motor movements effectively. *Id.* The ALJ attested that he had carefully considered fibromyalgia under SSR 12-2p, and obesity with the parameters of SSR 02-01p. *Id.* However, the ALJ stated that none of these impairments meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, subpart P, Appendix 1. *Id.*

The ALJ also determined that the severity of Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06 as Plaintiff has mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation of an extended duration. [R. 28-29].

The ALJ generally attributed Plaintiff's limitations to physical rather than psychiatric disorders. [R. 28]. Plaintiff reports constant, unbearable pain, and that his significant other must help him with many activities of daily living. *Id.* Plaintiff reports that he can only feed himself half of the time, that he does no housework, no cooking, and that he has to take medication to sleep and only sleeps two to three hours. *Id.* However, Plaintiff reported that he can take care of a four-year old child while his wife works on the weekends, he can use the toilet without assistance, shop for groceries for up to 1.5 hours bi-weekly, and he drove until his license was suspended. [R. 29]. Moreover, Plaintiff reported to Lourdes Pola, Ph.D., in a consultative examination in May 2013, that he is independent for daily living skills, stating that he raises pigeons and sometimes washes the dishes. *Id.*

Plaintiff reports that he has no social life outside of his immediate family, that he and his wife share time together, but also that he goes shopping bi-weekly and goes to his son's school twice a week. *Id.* There is no evidence documenting that Plaintiff has significant difficulty getting along with others, and he has no history of altercations, evictions, firings, or antisocial

behavior. *Id.* Plaintiff reports that he has no problems getting along with family, friends, neighbors, or others. *Id.* Therefore, the ALJ found only moderate difficulties in Plaintiff's social functioning. *Id.*

Regarding Plaintiff's concentration, persistence, or pace, there is no documentation of significant problems in work settings. *Id.* Plaintiff reports that pain keeps him from paying attention, that he is unable to follow instructions well, and that he cannot handle changes in routine well. *Id.* However, Plaintiff also reports that he watches television and can follow the plot sometimes, and that he needs no reminders to take his medications. *Id.* He reports that he can pay attention for periods of 15 to 30 minutes. *Id.* Dr. Pola observed that Plaintiff's immediate and remote memories were fair, but that his concentration was poor. *Id.* Dr. Pola notes that the fluctuations in attention and concentration "appear to be due to his high level of anxiety during the evaluation." *Id.* The ALJ noted that there have been no episodes of decompensation of extended duration. *Id.*

The ALJ also found that the evidence failed to establish the presence of paragraph C criteria. *Id.* The ALJ stated that Plaintiff does not have a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of his ability to do basic activities; has had no episodes of decompensation of extended duration; has had no residual disease process that has resulted in such marginal adjustment such that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate; and has no current history of one or more years' inability to function outside of a highly supportive living arrangement. *Id.* Plaintiff also does not have a complete inability to function independently outside the area of his home. [R. 30]. Therefore, listing 12.04 "paragraph B" or "paragraph C" criteria had not been met in this case.

[R. 29].

The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 30]. He then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions. *Id.*

The ALJ considered Plaintiff's hearing testimony and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some symptoms; however, allegations concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" because they are not supported by the medical record or by Plaintiff's appearance and behavior at the hearing. [R. 31-32]. The ALJ considered Plaintiff's medical history in detail and concluded that the RFC was supported by the objective medical evidence and the opinions of Dr. Edouard, Dr. Patel, Dr. Clark, and Dr. Chase. [R. 35]. The ALJ also found that the objective medical evidence and testimony did not support Plaintiff's allegations about the severity of his pain. The ALJ pointed to Plaintiff's testimony that he was experiencing 10/10 pain from fibromyalgia, the worst pain possible at the time of the hearing, but maintaining normal appearance and demeanor. [R. 32].The ALJ also noted that Plaintiff testified that he could not sit for more than fifteen minutes, but at the point that he made the statement he had already been sitting for thirty minutes without issue. *Id.* The ALJ also pointed to Plaintiff's lack of treatment for fibromyalgia and his mental impairments, and he pointed to the fact that Plaintiff maintained normal gait, and 4-5/5 muscle strength throughout his extremities, and normal range

39

of motion in his other joints. [R. 30, 35]. The ALJ concluded that the objective medical evidence, the appearance and demeanor of Plaintiff, observations by his treating sources, and the well supported opinions all suggest that the symptoms and limitations on the activities of daily living reported by Plaintiff are not as extensive as he has reported. [R. 35].

The ALJ next found that Plaintiff is unable to perform any past relevant work. [R. 35]. He noted that Plaintiff was 42 years old on the alleged disability onset date. [R. 36]. The ALJ stated that Plaintiff cannot communicate in English, and explained that transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills. *Id.* He concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including cleaner and polisher, and plastic mold machine operator. *Id.* The ALJ found that the vocational expert's testimony was consistent with the information found in the DOT. [R. 36]. The ALJ concluded that Plaintiff has not been under a disability since March 1, 2012, through the date of his decision.

The Court finds that the ALJ properly followed the "pain standard" discussed in *Holt*. As stated in *Holt*: "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." 921 F.2d at 1223. After a careful review of the record, the Court finds that the ALJ did articulate several explicit and adequate reasons for discrediting Plaintiff's testimony. This Court cannot reweigh the evidence or substitute its judgment for that of the ALJ.

Furthermore, the Court finds that substantial evidence, which is described in detail above, supports the ALJ's mental and physical RFC and findings. The Court finds that the ALJ clearly considered Plaintiff's entire medical condition in evaluating Plaintiff's RFC and the credibility of

Plaintiff's subjective claims. The Court also finds that the vocational findings based on the RFC are supported by the substantial record evidence. The Court concludes that the record contains substantial evidence to support the denial of benefits to Plaintiff and that the correct legal standards have been applied. Accordingly, the ALJ's decision is due to be affirmed.

B. Whether the ALJ erred by not giving controlling weight to the treating physicians

In applying the proper standard to Plaintiff's *pro se* Motion for Summary Judgment, the Court will also consider Plaintiff's Motion to mean that Plaintiff is asserting that the ALJ erred by not giving controlling weight to his treating physician, Dr. Ference. *See* DE 18.

Dr. Ference provided a medical source statement in April, 2015, in which he opined that Plaintiff cannot do any work, can stand for no longer than 15 minutes at a time, but no more than 30 minutes in a work day, can sit up to 30 minutes at a time, but no more than one hour in a work day, can lift nothing occasionally and nothing frequently, and can never bend, stoop, or raise either arm above shoulder level. [R. 675-677]. Dr. Ference also stated that Plaintiff "cannot work at all due to severe pain and fatigue, decreased concentration, [and] difficulty sleeping." [R. 677].

The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F.3d at 1440. "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence

supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*[6]

The ALJ gave little weight to the statement of Dr. Ference because the opinion that the Plaintiff cannot work at all is a determination reserved for the Commissioner. *See* 20 C.F.R. § 416.927(d)(1); SSR 96-5p, R. 34. The ALJ also gave Dr. Ference's opinion little weight because the objective medical evidence does not reflect the severity opined by Dr. Ference. [R. 34]. Indeed, the ALJ noted that Dr. Ference's opinion appeared to rely primarily on Plaintiff's subjective complaints. The ALJ pointed to medical records which showed Plaintiff has consistently exhibited normal gait, gotten on and off the examination table without problem in Dr. Edouard's exam, and has demonstrated no limitations on his range of motion, except for his lumbar spine. [R. 34]. The ALJ also reasoned that Plaintiff was able to toe and heel walk and exhibited strength in his extremities that is typically 4/5. *Id.* The ALJ stated that Dr. Edouard only found tenderness in Plaintiff's left shoulder. *Id.* The ALJ also found that Plaintiff routinely presented as being in no acute distress, and concluded that the limitations described in Dr. Ference's opinion were "quite extreme and unsupported by any other physician." *Id.*

The Court has reviewed the ALJ's decision and finds that the ALJ stated with particularity the weight he gave to different medical opinions and the reasons why, as required. The ALJ also established good cause for not giving substantial weight to Dr. Ference, Plaintiff's treating physician. The Eleventh Circuit has found that "[t]he treating physician's report may be

---

[6] The Court notes that the law on the deference to give treating physicians has changed, but only for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1527. Here, Plaintiff's claim was filed prior to March 27, 2017.

discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (citing *Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987)). Dr. Ference's findings that Plaintiff has severe limitations are unsupported by the medical evidence and by the other examining physicians.

C. <u>Whether New Evidence Submitted with Plaintiff's Brief is Material and Warrants Remand</u>

In Plaintiff's Motion for Summary Judgment [DE 18], Plaintiff attached a letter from Dr. Ference, dated August 15, 2017, which states: "Mr. Rene Amechazurra has pain throughout his body due to Fibromyalgia. He is permanently disabled due to his pain and he cannot work." [DE 18-2]. Evidence submitted to the district court may be considered only to determine if remand is warranted under sentence six of 42 U.S.C. § 405(g). *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1267-68 (11th Cir. 2007); *Caulder v. Bowen*, 791 F.2d 872, 876 (11th Cir. 1986); *Cherry v. Heckler*, 760 F.2d 1186, 1192 (11th Cir. 1985); *Taylor-Tillotson v. Colvin*, No. 13-80907-CIV-W M, 2014 WL 7211888, at *10 (S.D. Fla. Dec. 18, 2014). To satisfy the criteria for a remand under sentence six of 42 U.S.C. § 405(g), a claimant must establish that: (1) the evidence is new and noncumulative; (2) the evidence is material such that a reasonable probability exists that it would change the administrative result; and (3) there was good cause for the failure to submit the evidence at the administrative level. See *Caulder*, 791 F.2d at 877; *Cherry*, 760 F.2d at 1192.

Plaintiff has failed to show that this evidence is material or that it would change the administrative result of Plaintiff's claim. Dr. Ference's letter states the same opinion that he had opined in his 2015 Medical Source Treating Statement. [R. 34]. It is not new and it is cumulative. It asserts the same opinion previously asserted by Dr. Ference, which the ALJ

rejected. The ALJ concluded that the limitations described by Dr. Ference in 2015 were quite extreme and unsupported by any other physician. *Id.* Therefore, since Dr. Ference's letter is not material, new, or non-cumulative, it does not warrant remand.

## IV.    CONCLUSION

The Court finds that the record contains substantial evidence to support the denial of benefits to Plaintiff. The Court further finds that the ALJ applied the correct legal standards.

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**. Accordingly, Plaintiff's Motion for Summary Judgment [DE 18] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 19] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 17th day of September, 2018.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

44